Estates of Suzanne and Wiliam J. Van Lede, Robert C. Van Lede, Executor v. Commissioner.
Estates of Van Lede v. Commissioner
Docket No. 5877-66.
United States Tax Court
T.C. Memo 1969-275; 1969 Tax Ct. Memo LEXIS 20; 28 T.C.M. (CCH) 1422; T.C.M. (RIA) 69275; December 16, 1969, Filed Emilio A. Dominianni, Pan American Bldg., 200 Park Ave., New York, N. Y., for the petitioner. Agatha L. Vorsanger, for the *21 respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in the income tax of Suzanne and William J. Van Lede for the taxable years ending December 31, 1961, 1962, and 1963 in the amounts of $8,719.19, $11,410.84, and $3,856.55, respectively. In an amended answer, respondent determined alternatively that Suzanne and William J.Van Lede received additional income in 1961, 1962, and 1963 in the amounts of $5,456.23, $1,516.74, and $2,146.01, respectively. Concessions have been made and the only issues for decision are: (1) whether William J. Van Lede was disabled within the meaning of sections 213(g)(3) and (4) of the Internal Revenue Code of 1954[1] in 1961, 1962, and 1963, and therefore entitled to the maximum medical deduction for those years; (2) alternatively, if William J. Van Lede was disabled, whether certain expenditures of Ledel, Inc., in 1961, 1962, and 1963 were incurred for the personal benefit of William and therefore constructive dividends to him; and (3) whether $15,000 received by William J. Van Lede in 1962 from Phillips Petroleum Company pursuant to a "Release and Indemnity *22 Agreement" is ordinary income to him in that year or qualifies for capital gains treatment. Findings of Fact Petitioners herein are the estates of Suzanne and William J. Van Lede. William J. Van Lede (hereinafter sometimes referred to as William) was born in 1888 and died on April 30, 1964. William's wife, Suzanne Van Lede (hereinafter sometimes referred to as Suzanne), died on May 24, 1963. William and Suzanne resided in New Rochelle, New York, prior to their deaths. Their son, Robert C. Van Lede (hereinafter sometimes referred to as Robert), is the duly appointed executor of each of their estates. William and Suzanne filed joint income tax returns for the years 1961 and 1962 with the district director of internal revenue, Manhattan, New York. A joint income tax return for the calendar year 1963, insofar as William was concerned, and for the taxable year January 1, 1963, to May 24, 1963, insofar as Suzanne was concerned, *23 was filed with the district director of internal revenue, Manhattan, New York. Suzanne's estate is a petitioner herein solely because of these joint returns. During the years 1961, 1962, and 1963, William was the sole shareholder of Ledel, Inc. (hereinafter sometimes referred to as Ledel), a corporation organized under the laws of New York State. Ledel was the export agent for a number of American firms which produced rubber chemicals and machinery used in the rubber industry. These products were sold to various subagents of Ledel in Belgium, Holland, Switzerland, Spain, Italy and Luxembourg, and to ETS. VAN LEDE ET COMPAGNIE, S.A.R.L., (hereinafter sometimes referred 1423 to as Compagnie), a corporation organized under the laws of the Republic of France in which William owned two-thirds of the stock and Robert the balance. Compagnie sold the rubber chemicals it received from Ledel to large French manufacturers of rubber goods. Ledel maintained a warehouse in Hoboken, New Jersey, and had an inventory valued at approximately $2o,000 to $25,000. Compagnie also maintained inventory, a warehouse and equipment in France. Compagnie's equipment included a truck to handle and deliver *24 merchandise, and a Clark elevator, operated at the warehouse to stock the merchandise as it was received. During the taxable years 1961, 1962, and 1963, Ledel's earned surplus and undivided profits were $147,309.66, $144,199.74 and $92,977.30, respectively. William was employed as president of Ledel from 1956 to 1961, and as gerant (translated manager) of Compagnie during the same period. In his capacity as executive officer of both companies he was engaged in extensive business activities, including the supervision of all personnel and operations, correspondence and meeting with customers, subagents and salesmen, and travel on company business. Approximately four or five months were spent by him in Europe each year, overseeing operations and making contacts with customers and agents alike. Aside from William, Ledel had only four other employees - Robert Van Lede, who was a salesman during the years 1956 to 1961; Suzanne, who acted as her husband's private secretary and handled his French correpondence while in Europe and the states; an accountant, and a secretary to Robert. In the period from 1956 to 1961, Compagnie had the following eight employees: William, Robert, a co-manager *25 and his secretary, two accountants and two salesmen. On April 11, 1958, Phillips Petroleum Company (hereinafter sometimes referred to as Phillips), one of Ledel's chief suppliers since 1946, entered an exclusive contract with Ledel for the sale of its carbon black in France. Ledel also entered into an agreement on September 1, 1958, with Phillips Chemical Company (hereinafter sometimes referred to as Chemical), a subsidiary of Phillips, for the exclusive sale in France of a synthetic rubber known as Philprene. Both agreements were to remain in effect for a specified period of time and thereafter be in force until terminated by either party giving written notice of termination to the other at least 90 days in advance of the date of termination specified in the notice. A third agreement between Compagnie and another Phillips' subsidiary, Phillips Petroleum International France, S.A. (hereinafter sometimes referred to as International), for the sale of carbon black in France, which became effective on November 1, 1960, had an analogous 90-day termination clause. The agreement of April 11, 1958, was terminated by a letter agreement between Phillips and Ledel on October 5, 1961. The *26 September 1, 1958, agreement was terminated as of March 31, 1962, (pursuant to its termination clause) by International, to which the contract had been assigned by Chemical. Likewise, the agreement dated November 1, 1960, between Compagnie and International, was terminated, effective March 31, 1962, pursuant to its termination clause. The termination of the agreements of September 1, 1958 to November 1, 1960, was the result of Phillips and its subsidiaries establishing their own sales' force in Europe. Early in 1962, meetings took place between representatives of Phillips and Robert Van Lede concerning the termination of the above-mentioned agreements. As a result of these meetings, a release and indemnity agreement was executed by Ledel on April 30, 1962, whereby Ledel released International, Phillips, and all of Phillips' subsidiaries from any liability resulting from their prior dealings with Ledel and from the termination of the September 1, 1958, agreement. Ledel received $40,000 as consideration for this release. A portion of the agreement was as follows: NOW, THEREFORE, for and in consideration of the payment by Phillips to Agent of the sum of Forty Thousand Dollars ($40,000.00) *27 at the First National City Bank, New York, New York, receipt of which is hereby acknowledged, Ledel, Inc. hereby releases and discharges Phillips Petroleum International Corporation, Phillips Petroleum Company and all of its other subsidiaries and affiliates, from all liabilities and claims of every kind and nature, including but not limited to, claims for expenses, commissions, damages and indemnities which Ledel, Inc., directly or indirectly, may now or hereafter have against Phillips Petroleum International Corporation, Phillips Petroleum Company and/or any of its other subsidiaries or affiliates, whether arising 1424 out of the termination of said agreement dated September 1, 1958, or out of any prior or related agreement or dealing between any of such parties. And, for the same consideration, Agent hereby binds and obligates itself, its successors and assigns, to defend, hold harmless and indemnify Phillips, Phillips Petroleum Company and its other subsidiaries and affiliates from and against any and all demands, suits, claims, liabilities, losses, damages and expenses of every kind and nature asserted against or incurred by Phillips, Phillips Petroleum Company and/or any *28 of its subsidiaries or affiliates at any time as a consequence of Agent having heretofore served as an Agent or subagent or distributor for either Phillips, Phillips Petroleum Company or any of its subsidiaries or affiliates, or as a consequence of the termination of any agreement between Agent and either Phillips, Phillips Petroleum Company or any of its subsidiaries or affiliates. Agent hereby agrees to execute such other and further documents as may be requested by Phillips in order to fully effectuate this release and indemnity agreement. A similarly worded release and indemnity agreement was also executed by Compagnie, releasing International, Phillips and all of its subsidiaries from any liabilities resulting from the agreement dated November 1, 1960, and from any prior dealings between Compagnie and Phillips or its subsidiares. Compagnie received 25,000 new francs (approximately $5,000) for the release. On the same date that Ledel executed its agreements with Phillips, Robert and William individually executed a release and indemnity agreement. This agreement, under which each received $15,000, reads in part: 1. We, jointly and severally, do hereby release and discharge *29 Phillips Petroleum Company and its subsidiaries and affiliates from all rights and claims either or both of us may now or hereafter have against Phillips Petroleum Company and/ or any of its subsidiaries or affiliates for personal services heretofore rendered by either or both of us. 2. We, jointly and severally, do hereby bind and obligate ourselves, our respective heirs, executors and administrators to defend, hold harmless and indemnify Phillips Petroleum Company and its subsidiaries and affiliates from and against any and all demands, suits, claims, liabilities, losses, damages and expenses of every kind and nature asserted against or incurred by Phillips Petroleum Company and/or any of its subsidiaries or affiliates at any time as a consequence of any company or corporation, foreign or domestic, in which either or both of us now have or have had an interest, having heretofore served as an agent or subagent or distributor for either Phillips Petroleum Company or any of its subsidiaries or affiliates, or as a consequence of the termination of any agreement between any such company or corporation, foreign or domestic, and either Phillips Petroleum Company or any of its subsidiaries *30 or affiliates. 3. We jointly or severally, do hereby agree to execute, or cause to be executed in behalf of any company or corporation controlled by either or both of us, such other and further documents as may be requested by Phillips Petroleum Company in order to fully effectuate this release and indemnity agreement. In August 1960, prior to the termination of the above-mentioned agreements, William suffered a severe coronary in France. He recuperated and returned to work. Shortly thereafter, on November 15, 1960, he was hospitalized for a stroke which occurred in New York City. After remaining in the hospital for approximately a month, he returned to his apartment in New York City in mid-December 1960. A hospital bed and other medical necessities were provided for his care there and nurses were in attendance both night and day. At this time William was paralyzed on his left side, could not walk, and his speech was slurred. During 1961, 1962, and 1963, William was under the care of a physician, and nurses were present around the clock. He received physical therapy daily to regain and keep in motion the muscles and ligaments of his left arm and leg which had been injured by *31 the stroke. He was also treated for high blood pressure and hypertension, congestive heart failure, heart pain and accumulations of fluid in the lungs which resulted from the poor function of the heart muscle. William's physical and emotional condition, described in somewhat more detail below, was the result of a tremendous degeneration in his vascular system and could be expected to be of indefinite duration and eventually result in death. In the last four months of 1961, William could walk with the aid of a cane and another person's assistance and also carry on brief conversations. He could, however, neither attend to his normal toilet functions without the assistance of a nurse nor bathe 1425 or shave himself without assistance. On several occasions William was subject to crying spells and was somewhat cantankerous. William moved from his apartment in New York City to his home in New Rochelle in the summer of 1962. His nurse, Eucebia S. Hunt, with the assistance of Suzanne, took over both night and day nursing duties at that time. His condition from September through December 1962, was the same as in late 1961. His crying spells continued, occurring, for example, when breakfast *32 was not served immediately upon request or when he was asked to make quick decisions. Also at times his vision was impaired. During the last four months of 1963, William's physical and emotional state continued unaltered. Despite his illness William was not confined to bed. On many occasions in 1962 and 1963 he went out, sometimes to shop, for a drive, or for lunch. He also attended church daily, watched television and sometimes read. During these three years William did not take care of paying household expenses. Until her death Suzanne wrote the vast majority of checks to cover them. William also continued as president of Ledel, and received a sizeable salary during 1961, 1962, and 1963. He became honorary chairman of its board as of January 1, 1964, when his son Robert became president. Previously Robert had been elected vice-president of Ledel in May 1960. During the years in question William lunched almost daily with Robert and on such occasions requested from him information concerning the operation of the business, though he would often be inattentive to his son's reply. He also presided at all six meetings of the board of directors of Ledel during the years in issue, *33 and wrote 31 corporate checks. Moreover, he occasionally had meetings with customers at which business was sometimes discussed. At some of these meetings he was cantankerous and often cried. After his stroke, William made two trips to Europe. On the first trip, he was accompanied by Suzanne, Robert, and a male nurse. He left by boat in July 1961, and returned by boat in mid-September. During this trip he stayed in a home outside of Paris and at times was visited there by agents and customers. Also, some conferences which William attended were held with customers and agents in the Paris office of Compagnie. When Suzanne died in 1963, William made his second European trip (of about three weeks' duration) to attend her funeral. During his stay he was visited by business contacts at a home outside of Paris and made some trips to the Paris office of Compagnie. He also met many business contacts at the funeral. In 1961, Ledel paid directly, or reimbursed William $983 for the expense of an airfare to Europe. In the same year, Ledel paid directly to William $450 by two checks marked "travel," and on December 31 made an entry in the voucher register of the corporation in the amount of *34 $5,277, as owing to William and marked "travel." Ledel also paid directly or reimbursed William for auto expenses incurred by him in the amount of $2,820.37 in 1961, and $1,134.83 in 1962, and paid the country club to which he belonged the sums of $1,355.09, $1,582.22, and $1,232.71 in 1961, 1962, and 1963, respectively. In 1963 Ledel paid $1,907.60 to the Fugazy Travel Bureau, of which $944.30 was the price of William's airfare to Europe in that year. All these amounts were deducted by Ledel in the years indicated as ordinary and necessary expenses of business. In an examination of the corporate returns of Ledel for the years 1961, 1962, and 1963, corporate officials represented to an internal revenue agent that the above-mentioned expenses were the expenses of William, incurred by him while conducting business of Ledel. As a result of this examination, portions of certain expenses were determined to be nondeductible. Of the amount of $5,727 for "travel" in 1961, [2] $3,477 was considered personal, unsubstantiated and not deductible by Ledel. As for the country club expenses, 40 percent was disallowed as not being a deductible expense of the corporation, or $542.04 in 1961 and $632.89 *35 in 1962. Fifty percent of the auto expenses was also disallowed, or $1,410.19 in 1961 and $567.42 in 1962. Ledel protested these disallowances in a letter of protest, dated May 5, 1965, in which the following statements were made by Robert concerning certain of these expenses: 2. Business expenses In the calendar year 1961 the taxpayer paid the following expenses: 1426 Maintenance and upkeep of automobile
$1,410.19
Traveling expenses
3,477.00
Expense for sales promotion 542.04
$5,429.23
During the year 1961 the taxpayer owned an automobile which was used by William J. Van Lede, president of the taxpayer, for purposes of business. The cost of maintenance and upkeep of this automobile incurred and paid by William J. Van Lede amounted to $2,820.38. This expense was reimbursed to William J. Van Lede by taxpayer and deducted from the adjusted gross income of the taxpayer. The examining agent designated $1,410.19 of the expenses paid by William J. Van Lede and reimbursed by the taxpayer as personal in nature and not an ordinary and necessary business expense. *36 This finding by the agent is erroneous and without foundation. The entire amount of $2,820.38 paid by William J. Van Lede as an employee rendering services for taxpayer and reimbursed to him by the taxpayer represents ordinary and necessary business expenses properly deductible pursuant to Secton 162 of the Internal Revenue Code. During the year 1961 the taxpayer reimbursed its president, William J. Van Lede, an amount of $13,873.62 for travel and entertainment expenses incurred and paid by him in connection with services rendered for the taxpayer. The taxpayer deducted from adjusted gross income this amount of $13,873.62. Of this deduction the examining agent designated $3,477.00 to be personal in nature, unsubstantiated and non-deductible. This finding by the agent is erroneous and without foundation. The entire amount of $13,873.62 paid by William J. Van Lede and reimbursed by taxpayer is substantiated and represents ordinary and necessary business expenses properly deductible pursuant to Section 162 of the Internal Revenue Code. During the year 1961 the taxpayer reimbursed its president, William J. Van Lede, an amount of $1,924.23 *37 for sales promotion expense incurred and paid by him in connection with services rendered for the taxpayer. The taxpayer deducted from adjusted gross income this amount of $1,924.23. Of this deduction the examining agent designated $542.04 to be personal in nature, unsubstantiated and notdeductible. This finding by the agent is erroneous and without foundation. The entire amount of $1,924.23 paid by William J. Van Lede and reimbursed by taxpayer is substantiated and represents ordinary and necessary business expenses properly deductible pursuant to Section 162 of the Internal Revenue Code. * * * 2. Busness Expenses In the calendar year 1962 the taxpayer paid the following expneses: Maintenance and upkeep of automobile
$ 567.42
Sales promotion expense 632.89
$1,200.31
During the year 1962 the taxpayer owned an automobile which was used by William J. Van Lede, president of the taxpayer, for purposes of business. The cost of maintenance and upkeep of this automobile incurred and paid by William J. Van Lede amounted to $1,134.83. This expense was reimbursed to William J. Van Lede by taxpayer and deducted from the adjusted gross income *38 of the taxpayer. The examining agent designated $567.42 of the expenses paid by William J. Van Lede and reimbursed by the taxpayer as personal in nature and not an ordinary and necessary business expense. This finding by the agent is erroneous and without foundation. The entire amount paid of $1,134.83 by William J. Van Lede as an employee rendering services for taxpayer and reimbursed to him by the taxpayer represents ordinary and necessary business expenses properly deductible pursuant to Section 162 of the Internal Revenue Code. During the year 1962 the taxpayer reimbursed its president, William J. Van Lede, an amount of $1,905.29 for sales promotion expense incurred and paid by him in connection with services rendered for the taxpayer. The taxpayer deducted from adjusted gross income this amount of $1,905.29. Of this deduction the examining agent designated $632.89 to be personal in nature, unsubstantiated and non-deductible. This finding by the agent is erroneous and without foundation. The entire amount of $1,905.29 paid by William J. Van Lede and reimbursed by taxpayer is substantiated and represents ordinary and necessary business expenses properly *39 deductible pursuant to Section 162 of the Internal Revenue Code. For the years 1961, 1962, and 1963, respondent determined that the amounts of the disallowed expenses of Ledel were constructive dividends to William in the years in which they were deducted by the corporation, on the grounds that they were incurred for his personal benefit. Petitioner stipulated that these were constructive dividends before trial. Respondent also 1427 determined that the sums of $21,455.82, $21,147 and $19,698.95, expended by Suzanne and William for medical expenses in 1961, 1962, and 1963, respectively, and deducted by them in their joint returns for those years, could not be deducted in full because William was not "disabled" within the meaning of section 213(g)(3)in each of those years and therefore not entitled to the increased medical deduction provided for therein. Finally, respondent determined that the $15,000 received by William under the release and indemnity agreement was ordinary income to him in 1962, rather than capital gains as had been claimed by William in his 1962 joint return. Subsequently, respondent amended his answer, and determined in the alternative *40 and therefore entitled to the maximum and therefore entitled to the maximum medical deductions, then those portions of the expenses previously allowed as a deduction to Ledel during the years in which William was employed, as well as the 1963 country club expenses in the amount of $1,201.71, [3] and the 1961 and 1963 airfare expenses which had been allowed in full to Ledel, were incurred for William's personal benefit and were therefore constructive dividends to him. Opinion Issue 1: Medical Deduction The first issue for decision is whether William was "disabled" within the meaning of section 213(g)(3)[4] so that his medical expenses in 1961, 1962, and 1963, qualify for the maximum medical deduction of 213 (g)(1)(A) [5] instead of the $10,000 allowed under section 213(c)(2). In ascertaining William's disability his condition as of the end of each of the three years is controlling under *41 section 213(g)(4). [6]
*42 The regulations promulgated under section 213(g)(3) state with regard to the meaning of "disabled": Sec. 1.213-2 Maximum limitation on deduction if taxpayer or spouse is age 65 or over and is disabled. * * * (c) Meaning of disabled. (1) An individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of longcontinued and indefinite duration. In determining whether an individual's impairment makes him unable to engage in any substantial gainful activity, primary consideration shall be given to the nature and severity of his impairment. Consideration shall also be given to other factors such as the individual's education, training, and work experience. The substantial gainful activity to which section 213(g) refers is the activity, or a comparable activity, in which the individual customarily engaged prior to the arising of the disability (or prior to retirement if the individual was retired at the time the disability arose). For purposes of section 213(g), housekeeping shall be considered the substantial gainful activity *43 of an individual whose primary activity is housekeeping. (2) Whether or not the impairment in a particular case constitutes a disability is to be determined with reference to all the facts in the case. * * * Any impairment, whether of lesser or greater severity, must be evaluated in terms of whether it does in fact prevent the individual from engaging in his customary or any comparable substantial gainful activity. 1428 (3) In order to meet the requirements of section 213(g), an impairment must be expected either to continue for a long and indefinite period or to result in death. Ordinarily, a terminal illness because of disease or injury would result in disability. Indefinite is used in the sense that it cannot reasonably be anticipated that the impairment will, in the foreseeable future, be so diminished as no longer to prevent substantial gainful activity. For example, an individual who suffers a bone fracture which prevents him from working for an extended period of time will not be considered disabled, if his recovery can be expected in the foreseeable future; if the fracture persistently fails to knit, the individual would ordinarily be considered disabled. (4) An *44 impairment which is remediable does not constitute a disability within the meaning of section 213(g). An individual will not be deemed disabled if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity. Respondent argues that the activity of William relating to the conduct of the business of Ledel, clearly establishes that he was capable of and in fact did engage in substantial gainful activity during the three years in issue. He bases his argument both on "business" activities of William during these three years and the various statements made by executives of Ledel during the course of the examination of that company's returns for 1961, 1962, and 1963. Petitioner, on the other hand, points out the seriousness of William's illness, his emotional and physical state after the stroke, and concludes therefrom that William was "disabled" within the meaning of the provision. He does not deny that William engaged in some business activity during the three years in question but strenuously urges that this activity *45 cannot be compared to William's pre-1961 functions as executive of Ledel. A person need not be permanently bedridden, confined to his home, or incapable of writing and thinking in order to be considered "disabled" within the meaning of section 213(g)(3). Even if confined to his home, an executive may be able with little hindrance to conduct his business by phone and through visits with his associates and customers. Likewise, someone may be able to leave his residence and perform some of the normal functions of everyday life without being capable of engaging in strenuous business activity. While William often went out to shop, for a drive or to church, and also wrote a few personal checks (the number of which were small in comparison to the checks written by Suzanne during this period for household bills and other personal matters) this activity on his part proves only that he was not physically incapable of leaving the house or mentally incapable of writing a few checks. The real question to be decided is William's ability to perform substantially in his former capacity - in short the effect of his illness on his business capability, as may be surmised from the facts of the illness *46 itself and from evidence of his activity during the years in issue. Before his illness, William's supervision of the activities of Ledel was extensive. His business activities consisted of the day-to-day overseeing of the company's operations with a considerable amount of time spent in developing and keeping in personal contact with customers and agents. His duties, in the words of Robert, were to supervise the whole operation from the time we placed an order with the principal here in the United States, taking care of the shipment, the bills of lading, the invoicing, constant contact with all sub-agent or customers through either correspondence, cables or telegram. And he also spent approximately 4 to 5 months in Europe every year contacting all his sub-agents and many customers, seeing and making sure that they were aware of the new products on the market and the problems of manufacturing. Ledel can most aptly be described as a one-man show, built on personal friendships developed by William over the years. After his stroke, we believe William was incapable of engaging in the business activities of Ledel to the extent and in the manner as previously, and indeed, was not actually *47 doing so. We agree with petitioner that William could not and did not engage in substantial gainful employment in 1961, 1962, and 1963, due to illness which affected his physical and emotional capabilities. After his stroke and until his death in 1964, William was under the constant care of a nurse and doctor, suffered from hypertension, congestive heart failure, heart pain and other physical ailments. During the last periods of all years in question he was unable to bathe, shave, walk without assistance or attend to his normal toilet functions. 1429 Emotionally, he was cantankerous, subject to crying spells, and had a short interest span - personality changes which may be attributed to the overall degeneration of his vascular system. Dr. Weinraub, William's personal phvsician beginning in mid-1962, testified that William's condition had stabilized with very little improvement after the stroke - and that it was of indefinite duration and most likely would result in death. From his testimony and the testimony of Miss Hunt, the full-time nurse after mid-1962 and the night nurse beginning in September 1961, we have found that William's condition, as described above, was serious *48 and existed at the ends of 1961, 1962, and 1963. From the nature of William's illness, it is hard for us to believe that he could have been very active in the business of Ledel. His crying spells, short attention span, and cantankerous behavior do not comport with an ability to deal with the everyday business of a corporation, especially one largely dependent on meeting and dealing with customers and agents. His inability to shave, bathe and perform other normal functions, plus the partial paralysis of his left side, would indicate an inability to be physically active in the business. After his stroke, William did not visit the office regularly, and the active conduct of the businesses was taken over by Robert. For example, in the negotiations with Phillips concerning the termination of its agreements with Ledel and Compagnie, Robert did almost all the negotiating. To be sure, William did sign the "release and indemnity" agreement, but the question of his legal competence to sign is not the question before us. Respondent points, however, to William's trips to Europe and his various other activities to substantiate his contention that, despite William's illness, he was engaged *49 in substantial gainful activity. William did contact, or was visited by customers and agents on his European trips. Also, while in the United States, he attended some conferences. The extent of business discussed at these visits and conferences is not shown by the record. William's condition was such, however, that we cannot believe that he was about to or did conduct negotiations or discuss matters at these meetings, which do not appear to have been numerous, in the manner in which he formerly did. We view many of these business meetings during this period to be more in the nature of mixed social-business gatherings, where business may have been discussed, as would be normal in such situations. As testified to by Robert, many of the people William was visited by or held conferences with were his friends. On some of these occasions, when Robert was present, William cried, was cantankerous, and held interest in the meetings for short periods of time. Despite such actions, these "conferences" continued because "all those people * * * were his friends, * * * they accepted it and put up with it." This testimony confirms the extent of impairment of William's business capabilities. *50 To substantiate his contentions, respondent further notes that William attended the six board meetings of Ledel during the years in question, signed some 31 checks of the corporation, and often requested information concerning the business from Robert during their luncheons together. The fact, however, that William attended board meetings, which from the minutes do not appear to have dealt with any more than pro forma matters, shows no more than that he was capable of going to the office on occasions and dealing with incidental corporate matters. His signature on the relatively few corporate checks proves only that he was capable of signing his name. Indeed, from 50 to 75 checks of Ledel were signed for the corporation each month during the years in question by an officer or authorized signatories other than William. As for the requests for information, Robert himself pointed out that his father would usually lose interest after the request. Moreover, the very fact that William had to ask such questions shows that his supervision and contact with Ledel was significantly reduced. At best all respondent has been able to do is point out isolated events or occurrences when William may *51 have conducted some business. These do not appear numerous. At any rate, to qualify for the maximum medical deduction, it is not necessary that the individual engage in no business activity. He merely must be incapable of engaging in substantial gainful activity. Respondent's main evidence, to rebut the impressive showing of petitioner as to William's illness and its effect on his business activity, is based on the statements made by corporate officials in connection with the examination of the returns of Ledel for the years 1961, 1962 and 1963. In this regard, the examiner, Mr. Jordan, testified that it was represented to him that the 1430 various expenses which were deducted by Ledel on its corporate income tax return, as noted in the statement of facts, were spent by William in connection with business activities of Ledel. Likewise, it was represented to him that William was paid his large salary because he was engaged in the business as its president. Mr. Jordan's entire testimony in this respect, however, is hearsay. While we accept the fact that statements were made and relied on in determining the corporate deficiencies involved in Ledel's returns, such statements are *52 not probative of the truth of the matter insofar as this litigation is concerned. There does remain, however, the protest letter of Ledel, signed by Robert, which states that the expenses of 1961 and 1962 were incurred by William in connection with business activities; the corporate returns of 1961 and 1962, signed by William, in which these expenses were deducted, and the minutes of the board meeting of December 27, 1962, in which it was resolved that William receive additional compensation for his "arduous negotiations with Phillips Petroleum Co." The protest letter does detract from Robert's testimony, concerning his father. Likewise, the signature of William on the returns and on the minutes of the board meeting lessens the impact of the evidence of petitioner. Nevertheless, we do not deem these statements sufficient to counterbalance the showing which petitioner has made. In light of the condition of William and the entire record, we believe that at best the statements of Robert in the protest were exaggerations and at worst incredulous. At any rate, we have heard the testimony of Robert himself concerning his father's activities and find it credible. Light is shed upon his *53 statements in this letter by what he said at trial with regard to the meetings between William and customers: My father was the business. The fact that he was there was business as far as I'm concerned. It was a contact, they maintained contact. Robert may well have felt that his father's so-called discussions or meetings constituted him engaged in business activities for the corporation, sufficient to warrant a salary and the expenses incurred by him. Of course, the statement that William was engaged in business activities is not the equivalent of stating that he was engaged in substantial gainful employment within the meaning of section 213(g)(3). William's activity may or may not have warranted his salary and the expenses incurred may have been, on occasion, "valid" expenses. We find and hold that at the ends of 1961, 1962 and 1963 William was no longer capable of, and did not engage in substantial gainful activity, due to illness which was to be of indefinite duration. His business activities with Ledel during this period were minimal and not substantially equivalent to that which he had engaged in prior to his illness. William was therefore disabled within the meaning of *54 sections 213(g)(3) and 213(g)(4), and petitioner is entitled to the maximum medical deduction for those years. Issue 2. Constructive Dividends Since we have held for petitioner on the above issue, we must consider respondent's alternative contention that the portions of the various expenses previously allowed as a deduction to Ledel in 1961 and 1962, as well as those expenses allowed in full in 1961 and 1963, were constructive dividends to William. Respondent made this alternative determination in an amended answer. In so doing, he has pleaded new matter within the meaning of Rule 32, Tax Court Rules of Practice, and therefore has the burden of proof on the issue. Herbert M. LaRue, 37 T.C. 39, 45 (1961). To sustain such burden respondent must show that the disputed payments were for William's benefit or in discharge of his obligations rather than for the benefit of the corporation or in discharge of its valid obligations. See Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied, 364 U.S. 833 (1960), and cases there cited. At first glance it may seem that since the medical deduction issue *55 was decided in favor of petitioner, respondent has met his burden of showing that the expenses were personal rather than corporate; however, in order to qualify for the maximum medical deduction, an individual need only be unable to engage in substantial gainful employment. William's activities with Ledel could have been sufficiently business related in certain instances to have validly necessitated business expenditures, while in sum total, as we have found, insufficient to preclude qualification under section 213(g)(3). Respondent's burden, moreover, is to show not only 1431 that these expenses were personal expenses but also that they were William's expenses, i.e., incurred for his, and not Ledel's, benefit. In deciding this issue, each expense will be dealt with separately. Though a portion of some of the expenses has already been stipulated to be constructive dividends by petitioner, the total amount of expense will be dealt with in each case, for it is clear that in order to show that portions of any expense above the stipulated amounts are constructive dividends, the entire amount must be considered such. Of course, even if we find against respondent on various expenses, *56 that will have no bearing on stipulated amounts. 1961 Travel Expenses Respondent contends that $5,727 was paid to William in 1961 as reimbursement for the expenses of his 1961 European trip, all of which was entirely personal in nature. To substantiate his contention that these expenses were incurred for the benefit of William, respondent relies, in part, on the two checks, marked "travel" and made out to William in the sums of $250 and $200, and the entry in the voucher register of the corporation, dated December 31, 1961, which indicates that $5,277 was owed to William for "travel." Neither the voucher register nor the checks, however, indicate that the "travel" expenses are William's and hence they provide no basis to substantiate respondent's contention. Respondent also points to the letter of protest of Ledel, wherein Robert states that the amount of $13,873.62, which includes the $5,727, represented travel and entertainment expenses paid by William and reimbursed by Ledel in connection with services rendered for the taxpayer. While we deem this statement sufficient to establish that the amount of $5,727 was actually paid to William, the letter does not state that this expense *57 was incurred in connection with services rendered for Ledel by William. We do not, therefore, consider this statement sufficient to warrant a finding that the amount was paid for the expenses of his travel in 1961, as opposed to the travel of someone else, whom he reimbursed. In the absence of other probative evidence that this amount was incurred for the benefit of William, we find and hold that respondent has failed on his burden of proof with regard to this expense. [7] We have no way to ascertain what part of the expenses might have been William's. The second travel expense in issue for 1961 is the airfare to Europe for that year in the amount *58 of $983, which was reimbursed directly to William by Ledel and originally allowed in its entirety by respondent as a business expense of the corporation. We find and hold that this expense is not a constructive dividend. William's trip to Europe was made by boat and therefore it is clear that the airplane fare was not his, nor proved to have been incurred for his benefit. Auto Expenses As stipulated, in the years 1961 and 1962, the corporation reimbursed William or directly paid him for auto expenses in the sum of $2,820.37 [8] and $1,134.83, respectively. This car was used exclusively by William and hence there can be no doubt that these expenses were William's and therefore incurred for his benefit. We are, however, faced with an inability to correlate specific auto expenses to any business or nonbusiness activity of William. [9] The car may have been utilized to go to the board meetings William attended or a few of the "conferences" where business may have been discussed. It may have been utilized by William when he went out shopping or for other various personal activities. We simply have no bases for determining the expenses related to either class of use. Accordingly, since *59 the burden is on the respondent to have furnished a basis for finding all the expenses to be personal, and the record is inconclusive as to their nature, we hold that the auto expenses, over and above that already so stipulated, are not constructive dividends to William. Country Club Expenses In 1961, 1962 and 1963, the corporation paid $1,355.09, $1,582.22, and $1,232.71, respectively, to the Suvanoy Country Club. 1432 Respondent contends that these amounts represent personal expenses incurred solely by William in 1961 and 1962, in the amount of $1,355.09 and $1,582.22, respectively, and in the amount of $1,201.71 in 1963. Mr. Jacoby, the secretary-treasurer of Ledel, stated at trial that there were three members of the club - Robert, William and Suzanne - and that the expenses incurred were for all three, rather than just William *60 alone. The only other probative evidence [10] as to for whom the expense was incurred relates to the 1961 and 1962 expenses. In the protest letter of Ledel it is stated that William was reimbursed in 1961 in the amount of $1,924.23 and $1,905.29 in 1962, "for sales promotion expense incurred and paid by him in connection with services rendered for the taxpayer." The 1961 figure, however, includes the country club expense, plus various other expenses which were incurred by Robert, and therefore it is obvious that the statement with respect to that year cannot be considered to mean that the expenses relating to the country club were all William's. Aside from this fact, the statement with regard to 1961, as well as 1962, is indefinite with respect to whether the expenses were William's. At best, therefore, there is no evidence of sufficient weight to substantiate that the expenses were incurred for William's benefit in 1961, 1962 or 1963. Accordingly, respondent fails his burden of proof. We find and hold that the country club expenses, over and above the amounts already so stipulated, were not constructive dividends to William in 1961, 1962 or 1963. *61 1963 Airfare to Europe The final expense in issue is William's $944.30 airfare to Europe in 1963. On this trip William attended the funeral of his wife Suzanne, but was also visited by various business associates and saw quite a few of them at the funeral and while he was in Europe. We decide and hold, however, that the primary purpose of the trip was for William to attend his wife's funeral. We cannot believe that the funeral was incidental, and business the primary motive for the trip. We believe that respondent has carried his burden of proof on this issue, and hold that this amount was a constructive dividend to William in 1963. Issue 3. Treatment of $15,000 The remaining issue for decision is whether the $15,000 payment to William in 1962 under the release and indemnity agreement constitutes ordinary income or qualifies for capital gains treatment. In order to qualify, petitioner must show that the money was received for the sale or exchange of a capital asset. Petitioner argues that: (1) the distributor's agreement between Ledel and Phillips, as well as the agreements between Compagnie and Phillips' subsidiaries, were capital assets; and (2) the money received by *62 William under the release and indemnity agreement executed by him and Robert individually was received for a cancellation of the Ledel and Compagnie agreements and constitutes a sale or exchange under section 1241, which states: SEC. 1241. CANCELLATION OF LEASE OR DISTRIBUTOR'S AGREEMENT. Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement (if the distributor has a substantial capital investment in the distributorship), shall be considered as amounts received in exchange for such lease or agreement. Respondent, on the other hand, argues that section 1241 does not apply on four grounds: (1) William was not a "distributor of goods"; (2) the termination of the agreements was not "a cancellation"; (3) there was no proof of a substantial capital investment by William; and (4) the $15,000 was not received for canceling the agreements. We need not deal with all four grounds upon which respondent relies, any one of which would preclude qualification under section 1241. As we interpret the individual release and indemnity agreement, no part of the $15,000 was received to cancel the company agreements *63 and accordingly section 1241 does not apply. The individual agreement does not state or indicate that the $15,000 was paid for canceling the company agreements. As we read it, William was to receive the amount in exchange for two promises: (1) under clause 1, a release of rights or claims for 1433 personal services he may have had against Phillips or its subsidiaries; and (2) under clause 2, an indemnification against any demands, suits, claims, etc., asserted against or incurred by Phillips or its subsidiaries, and as a consequence of either Ledel or Compagnie having served as an agent or subagent or distributor for them. Only in clause 2 is any mention of the agreements' termination made and that is in the context of William's promise to indemnify Phillips. Even though Ledel and Compagnie on the same day discharged Phillips and its subsidiaries from liabilities and claims under the agreements, this promise of indemnification may have had some worth since there also could have been claims by parties, other than Ledel or Compagnie, against Phillips or its subsidiaries arising from the terminations. We cannot interpret the promise to mean that William received money for allowing *64 the cancellation of the agreements, though obviously the receipt of the money was related to the agreements' termination. Accordingly, the receipt of the $15,000 cannot be considered as received for the sale or exchange of a capital asset under section 1241. Nonqualification under section 1241 does not preclude a finding of sale or exchange based on other grounds, section 1.1241-1(a), Income Tax Regs., but petitioner furnishes no other basis for such a holding. It was his burden of proof to show that the Commissioner was incorrect in determining that the amount was ordinary income, rather than capital gains derived from the sale or exchange of a capital asset. He has failed to do so. Accordingly, we find and hold the $15,000 received by William was ordinary income to him in 1962. Decision will be entered under Rule 50. Footnotes
1. All references are to the 1954 Code unless otherwise indicated. Section 213(g)↩ was repealed by sec. 106(d)(1) of Pub. L. 89-97, July 30, 1965, effective (sec. 106(e) of Pub. L. 89-97, July 30, 1965) for taxable years beginning after December 31, 1966.
2. The sum is comprised of the $450 in checks to William and the voucher figure of $5,277.↩
3. We are unclear as to how this figure was arrived at. The books of Ledel, from which this total expense is derived, do not total this amount in 1963, but rather indicated that $1,232.71 was paid to the club and deducted as sales and promotional expense in the income tax return for that year.↩
4. SEC. 213. MEDICAL, DENTAL, ETC., EXPENses./ * * * (g) Maximum Limitation of Taxpayer or Spouse Has Attained Age 65 and Is Disabled. - * * * (3) Meaning of Disabled. - For purposes of paragraph (1), an individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. * * * ↩
5. SEC. 213(g)(1). (A) $15,000, if the taxpayer has attained the age of 65 before the close of the taxable year and is disabled, or if his spouse has attained the age of 65 before the close of the taxable year and is disabled and if his spouse does not make a separate return for the taxable year, * * * The $15,000 figure was increased to $20,000 in 1962 by Pub. L. 87-863, sec. 1(b). ↩
6. (4) Determination of Status. - For purposes of paragraph (1), the determination as to whether the taxpayer or his spouse is disabled shall be made as of the close of the taxable year of the taxpayer, except that if his spouse dies during such taxable year such determination shall be made with respect to his spouse as of the time of such death.↩
7. Mr. Jordan testified that a total of $5,727 was represented to him to be reimbursement paid to William for his expenses on the European trip. This testimony was hearsay and cannot be a basis for a determination that the expenses were actually related to that trip or that they were incurred for William's benefit. Likewise, the stipulation of petitioner that expenses for a European trip in 1961 were constructive dividends to William in the amount of $3,477 offers no basis for an inference relating to amounts above this figure.↩
8. We note that the stipulation was in error in 1961, since part of the $2,820.37 included depreciation on the car. ↩
9. No testimony was forwarded to break down the various expenses between insurance, garage, gas, etc., other than an approximation by Mr. Jacoby, an accountant for Ledel, that approximately $60 per month was a garage charge.↩
10. Mr. Jordan testified that it was represented to him by Mr. Jacoby that all the expenses were for William, but again this is merely hearsay and cannot be utilized for determining the truth of the matter.↩